Date signed September 30, 2010



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MARYLAND
### at GREENBELT

| | | | |
|---|---|---|---|
| In re: | * | | |
| Kevin Newcomer, | * | Case No. | 02-13178 |
| | * | Chapter | 13 |
| Debtor | * | | |
| * * * * * * * * * * * * * * * * * * | * | | |
| Kevin Newcomer, | * | | |
| Plaintiff, | * | | |
| v. | * | Adv. No. | 07-479 |
| Litton Loan Servicing, L.P., | * | | |
| Defendant. | * | | |

## MEMORANDUM OPINION

In this adversary proceeding, plaintiff Kevin K. Newcomer ("Plaintiff"), a former

chapter 13 debtor, seeks damages against Litton Loan Servicing, LP ("Defendant"),

alleging violations of the confirmed plan and various Bankruptcy Code provisions.

Specifically, Plaintiff asserts that Defendant, which services a loan secured by a deed of

trust on Plaintiff's residence, violated the automatic stay of the Bankruptcy Code as well as the confirmed chapter 13 plan and other bankruptcy provisions by, among other things, misapplying loan and plan payments during the term of the chapter 13 plan.

Following this Court's ruling on summary judgment,[1] the remaining counts in the amended complaint assert claims for violation of the automatic stay of §362 of the Bankruptcy Code[2] (Count 1); violation of §1327 and the confirmed plan (Count 2); and violation of §1328 (Count 3).  Following a three-day trial, and for the reasons stated herein, the Court concludes that Homecomings Financial, LLC, which serviced the loan before Defendant, violated the automatic stay and the terms of the plan and §1327 of the Bankruptcy Code by requiring Plaintiff (and his wife) to pay a prepetition obligation – *viz.*, the escrow deficiency that existed as of the petition date – as a condition of keeping the loan current post-petition.  Homecomings also included most, if not all, of the prepetition escrow deficiency in its proof of claim and recovered those amounts through Plaintiff's plan payments.  The violation, therefore, is particularly egregious because Homecomings not only improperly collected the prepetition obligation from post-petition payments, it collected it twice.

However, Plaintiff has settled his dispute with Homecomings and it is no longer a party to this action.  The Court does conclude, though, that Plaintiff is entitled to a recalculation of the correct amount due on the Loan.  The Court will require Defendant to recalculate the amount due on the loan by removing any post-petition obligation to pay the prepetition escrow deficiency, as provided more fully herein and in the order that

---

[1] On summary judgment, the Court, among other things, dismissed Count 4 (intentional infliction of emotional distress), dismissed all claims brought by Plaintiff's wife for lack of standing, and resolved other issues.  *See* Docket No. 186.

[2] Plaintiff's bankruptcy case was filed in 2002.  Therefore, all references to statutory provisions of the Bankruptcy Code in this Memorandum Opinion are to the 2002 version of the Code.

accompanies this opinion.  The Court will also allow Plaintiff to file a petition for attorney's fees and costs, focusing specifically on Defendant's, rather than Homecomings', conduct.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334, 157(a), and Local Rule 402 of the United States District Court for the District of Maryland.  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) & (O).  The following constitutes the Court's findings of fact and conclusions of law.

## FINDINGS OF FACT

A.  The Loan and the Bankruptcy Case.

On March 13, 2002, Plaintiff filed for Chapter 13 relief in this Court, initiating Case No. 02-13178.  Plaintiff's wife, Louise Newcomer ("Mrs. Newcomer"), did not join in the petition and was not a debtor in bankruptcy at any time after Plaintiff commenced his case.  Mrs. Newcomer was a debtor in two previous bankruptcy cases which were closed before Plaintiff commenced his bankruptcy case.

On or about May 20, 1996, Mrs. Newcomer entered into a residential real estate loan (the "Loan") pursuant to which she executed a promissory note (the "Note") in favor of First Savings Mortgage Corporation in the principal amount of $89,350, secured by a deed of trust (the "Deed of Trust") against 2617 Newton Street, Wheaton, MD (the "Property").

At the time Mrs. Newcomer entered into the Loan, Plaintiff did not own an interest in the Property.  He is not and has never been a party to the Note or the Deed of Trust.

Plaintiff acquired an interest in the Property in 2000. Mrs. Newcomer executed and had recorded a quitclaim deed dated June 2, 2000, transferring her interest in the Property to herself and Plaintiff, as tenants by the entirety. Plaintiff made a handwritten notation on the quitclaim deed stating that "Kevin and Louise have made all mortgage payments and will continue to make all mortgage payments in the future. No Grantor or grantee is assuming liability for a debt or is being relieved of liability for debt in this transaction."

The precipitating cause of Plaintiff's bankruptcy filing was that the Note was in default. At that time, the Note and Deed of Trust were serviced by Homecomings Financial, LLC ("Homecomings"). Homecomings filed a proof of claim in the case for arrears under the Loan in the amount of $12,683.07, consisting of missed monthly mortgage payments of $9,735.32, late charges of $389.92, foreclosure fees of $1,275.00, foreclosure costs of $1,172.83 and trustee sale advertising of $110.00.

Plaintiff filed a Chapter 13 Plan (the "Plan") on March 28, 2002. The Plan required Plaintiff to make sixty payments to the trustee in the amount of $592.00 (the "Plan Payments"). The Plan provided, in relevant part, that "the trustee will cure all pre-petition arrears, costs, and fees in full (100%), required by 11 USC §1325(a)(5) on the following claim[ ] . . . Homecomings Financial Network." The Plan also provided that "the debtor shall maintain post-petition payments directly while the case is pending." The Plan was confirmed by Order Confirming Plan entered on October 22, 2002.

On October 19, 2006, the chapter 13 trustee filed the Notice of Plan Completion. Plaintiff received his discharge that same day. The chapter 13 trustee filed the Final Report and Account on January 10, 2007. The Final Report and Account reflects that the

4

chapter 13 trustee paid Homecomings and Defendant $12,683.07, the full amount of the arrearage claim as set forth in the proof of claim, from Plan Payments.  The bankruptcy case was closed on January 16, 2007.

On February 28, 2007, Plaintiff filed a motion to reopen the bankruptcy case in order to file a motion to hold Defendant in contempt for violating the discharge injunction of §524.  The Court reopened the bankruptcy case on March 12, 2007, and Plaintiff filed the contempt motion the next day.   The contempt motion asserted that Plaintiff made all of his payments under the Plan and kept the Note payments current post-petition, but nevertheless Defendant, in violation of the Bankruptcy Code, charged late fees and asserted that the Note was in default.

On June 19, 2007, Plaintiff withdrew the contempt motion and filed this adversary proceeding.[3]  Plaintiff originally sued both Defendant and Homecomings, but later settled with Homecomings, and proceeded against Defendant.

1.  Plan Payments

Plaintiff managed the household finances.  He opened the mail and paid the bills.  During his bankruptcy case, Plaintiff had the family responsibility for mailing the Plan Payments to the trustee.  He also had the family responsibility for mailing the post-petition Loan payments (the "Loan Payments") directly to Homecomings or Defendant, as the case may be.

There is no dispute between the parties, and the Court finds, that Plaintiff completed his Plan Payments, and the trustee paid to Homecomings and Defendant the

---

[3] In the original complaint, Plaintiff brought ten counts for relief.  Numerous counts were dismissed by the Court on Defendant's motion to dismiss or were withdrawn by Plaintiff.  Plaintiff filed the Amended Complaint (the "Amended Complaint") on December 12, 2007, bringing the three counts described above and a count for intentional infliction of emotional distress.  That latter count was dismissed on summary judgment.  *See* n. 1.

total amount of the prepetition arrears set forth in Homecomings' proof of claim: $12,683.07. The Court further finds that the prepetition default on the Loan was cured during the course of the Plan.

      2.  Loan Payments

As stated above, at the time the case was filed, the Loan was being serviced by Homecomings. The servicing rights on the Loan were transferred from Homecomings to Defendant in February 2004. Defendant services the Loan; it does not own, nor has it ever owned, the Loan.

At trial, the parties stated that there was no dispute between them over the date or amount of the Newcomers' Loan Payments. The statement proved not to be accurate, as a comparison of the primary exhibits the parties relied on to establish the amount and date of the Loan Payments did not agree. *Compare* Ex. C to the Report of Kevin P Byers, CPA. (Pl. Ex. 29) *with* Def. Ex. 21.

The parties differed on two payments. Plaintiff's records reflect that he made a Loan Payment of $849.70 on May 13, 2003. Defendant's summary chart of Loan Payments does not show that this payment was made. *See* Def. Ex. 21, p. 1 (not showing a payment on May 13, 2003). However, Homecomings' internal detailed financial transaction report shows that this payment was in fact received by Homecomings. *See* Def. Ex. 18 at p. HFN043, transaction #213 (dated May 13, 2003). The Court finds that Plaintiff made a Loan Payment of $849.70 on May 13, 2003.

Defendant's records reflect that Plaintiff made a Loan Payment on November 10, 2004 in the amount of $764.07. Neither the Plaintiff nor his expert contended that this payment was made. The timing and amount of Loan Payments from December 1, 2004

onward point to the conclusion that Plaintiff made Loan Payments each month as if he had not made a Loan Payment of $764.07 on or about November 10, 2004.  The Court finds and concludes that Plaintiff did not make a Loan Payment of $764.07 on November 10, 2004.

Appendix A to this opinion sets forth the Court's findings on the Loan transaction details while Homecomings serviced the Loan (*i.e.*, from the petition date in March 2002 until February 2004).  It lists the monthly amounts due on the Loan according to Homecomings' records, broken down by principal, interest and escrow.  Appendix A also shows the date and amount of the Loan Payments made by Plaintiff during that period.  It shows, and the Court finds, that during the Plan period in which Homecomings serviced the Loan, Homecomings' records reflect that a total of $24,129.53 was due on the Loan, including principal, interest and escrow.  Appendix A further shows that, during that period, Plaintiff made a total of $21,569.26 in Loan Payments.  Thus, during the period in which Homecomings serviced the Loan, Plaintiff's total Loan Payments were $2,560.27 less than Homecomings' records reflected was due.

Appendix B to this opinion sets forth the Court's findings on the Loan transaction details while Defendant serviced the Loan (*i.e.*, from February 2004 until the Plan completion in October 2006).  It lists the monthly amounts due on the Loan according to Defendant's records, broken down by principal, interest and escrow.  Appendix B also shows the date and amount of the Loan Payments made by Plaintiff during that period.  It shows, and the Court finds, that during the period in which Defendant serviced the Loan, Defendant's records reflect that a total of $26,691.67 was due on the Loan, including principal, interest and escrow.  Appendix B further shows that, during that period,

Plaintiff made a total of $27,039.94 in Loan Payments.  Thus, during the period in which Defendant serviced the Loan, Plaintiff's total Loan Payments were $348.27 more than Defendant's records reflected was due.

During the entire Plan term, the total Loan Payments made by Plaintiff were $2,212.00 less than the principal, interest and escrow due on the Loan according to Homecomings' and Defendant's records ($2,560.27 shortage while Homecomings serviced the Loan minus $348.27 overage while Defendant serviced the Loan).

As  Appendix A shows, of the nine payments due during the period April 1, 2002 through December 1, 2002, the Newcomers made five of those payments after the fifteen-day grace period allowed under the Loan documents (April 1, June 1, August 1, September 1, and November 1).[4]  Beginning with the payment due January 1, 2003, however, the Newcomers made all Loan Payments on time or early.

That is not to say, however, that Plaintiff made all Loan Payments for the full amount due according to Homecomings' records.  Each Loan Payment included a component for principal and interest and a component for escrow for property taxes. There is no material dispute between the parties as to the amount of principal and interest that was due on the Loan for any month during the Plan term.[5]  The amount of principal and interest that was due each month during the life of the Plan is set forth in Appendices A and B under the column headed "Amount of Princ & Int Due Per [Homecomings/Defendant]."  As shown on Appendices A and B, with the exception of the July 16, 2002 Loan Payment, the Newcomers' Loan Payment each month during the

---

[4] The Note provided that a late charge was payable if the holder had not received a monthly payment "by the end of 15 calendar days after the date it is due." Def. Ex. 1 at ¶7(A). Payments were due on the first of every month.  *Id*. at ¶3(A).
[5] The Note was an adjustable rate note; the interest rate adjusted every six months.

Plan term was greater than the amount of the principal and interest component of the amount due on the Loan.

The same is not true when the escrow component of the monthly amount due is taken into account. As shown on Appendix A, during the period from April 1, 2002 through July 1, 2003, every Loan Payment was less than the amount of the total monthly payment due, taking into account principal, interest and escrow, according to Homecomings' records. The dispute between the parties that continues today concerning the correct amount due on the Loan is substantially, if not entirely, the result of the difference between the amount Homecomings contended was due on the Loan during the period April 1, 2002 and July 1, 2003 and the amount of the Loan Payments made during that time.

By letter dated August 8, 2002, Homecomings sent to Mrs. Newcomer an escrow account analysis (the "August 2002 Escrow Analysis") (Def. Ex. 4). The August 2002 Escrow Analysis was addressed to Mrs. Newcomer. Plaintiff initially could not recall seeing the August 2002 Escrow Analysis. At trial, Defendant produced a second copy of the August 2002 Escrow Analysis with a cover page addressed directly to Plaintiff showing it was sent by facsimile to him at the Newcomer's home fax number. The Court finds that Homecomings both mailed the August 2002 Escrow Analysis to Mrs. Newcomer and sent a copy by facsimile to Plaintiff at his home, and that Plaintiff received the August 2002 Escrow Analysis.

Although dated August 8, 2002, the August 2002 Escrow Analysis states that its "effective date" is November 1, 2001 through October 2002. It states that the "[f]ollowing is an analysis of your escrow account in accordance with the Real Estate

Settlement Procedures Act (RESPA).  The analysis calculates your new escrow payment based on the projected escrow activity for the coming period."  It states the previous payment due on the loan was $1,149.91, comprised of principal and interest of $910.74 and escrow of $239.17.  The letter states that the new monthly principal and interest payment on the Loan is $974.74 and the new monthly escrow payment is $61.16 (comprised of an anticipated property tax payment of $733.91 divided by 12 months).  Finally, it identifies an escrow shortage on the Loan of $2,709.82, and therefore adds to the monthly payment a "shortage spread" of $225.82 (or $2,709.82 divided by 12).  The "new monthly payment effective on 11/01/01" is $1,261.72 (or $974.74 principal and interest plus $61.16 tax escrow plus $225.82 for the escrow shortage).

The August 2002 Escrow Analysis is defective in several respects.  It was dated and sent on August 8, 2002, but it sets forth a "new monthly payment" to be effective on November 1, 2001.  Obviously, the Newcomers could not retroactively alter their past Loan Payments to that date.

Further, the amount of the new monthly payment set forth in it – $1,261.72 – is not the amount that Homecomings' records reflect was due for any month during the post-petition period beginning April 1, 2002.  *See* Appendix A; *see also* Def. Ex. 21. Homecomings' records reflect that the monthly amount for the payments due on April 1, May 1 and June 1, 2002 was $1,197.72, and for the payments due on July 1, August 1, September 1 and October 1, 2002 was $1,135.58.  *See id*.  These amounts were consistent with the deposition testimony of Homecomings' Rule 30(b)(6)[6] representative witness as introduced at trial and the amounts Defendant contends were due for that period.

---

[6] Fed. R. Civ. P. 30(b)(6).

Thus, the new monthly amount due set forth in the August 2002 Escrow Analysis was $64 greater than the amount Homecomings' representative testified was the correct amount due for the period of April 2002 through June 2002. The new monthly amount due was $126.14 greater than the amount Homecomings' representative testified was the correct amount due for the period of July 2002 through October 2002. In determining whether Plaintiff was current on the Loan post-petition, the Court ignores the monthly amount due as set forth in the August 2002 Escrow Analysis, and uses the lower amounts stated in Homecomings' deposition testimony, as shown on Appendix A.

Finally, the August 2002 Escrow Analysis required Mrs. Newcomer to pay, through post-petition Loan Payments, the escrow deficiency due at the time Plaintiff filed his bankruptcy case. At that time, there was an escrow deficiency of $2,823.83 (the "Prepetition Escrow Deficiency"). This is shown on the face of the August 2002 Escrow Analysis, which states the starting escrow deficiency balance as of April 1, 2002 was $2,823.83. Def. Ex. 4, p. 1. It is also shown in Plaintiff's expert's report. *See* Pl. Ex. 29, Ex. B, line 4, under the heading "Combined Escrow Balance." In the August 2002 Escrow Analysis, Homecomings included the Prepetition Escrow Deficiency in its calculation of the new monthly payment due on the Loan. However, in its proof of claim, Homecomings included eight unpaid prepetition monthly payments. *See* Pl. Ex. 5, p. 2. These eight unpaid payments included unpaid escrow payments of $2,129.40. Pl. Ex. 29, p. 3. Thus, Homecomings included at least $2,129.40[7] of the Prepetition Escrow Deficiency in the proof of claim. Homecomings thereby sought to recover the Prepetition

---

[7] Although it appears likely that the balance of the Prepetition Escrow Deficiency was also included in the proof of claim, that fact cannot be established from the record.

Escrow Deficiency both through the increased post-petition monthly payments as reflected in the August 2002 Escrow Analysis and through the proof of claim.

Homecomings sent to Mrs. Newcomer a second escrow analysis dated May 21, 2003 (the "May 2003 Escrow Analysis") (Def. Ex. 5). The May 2003 Escrow Analysis stated that the monthly amount due on the Loan would be reduced to $791.93 from $1,261.72 beginning on August 1, 2003. The reduction was due primarily to the elimination of the escrow shortage that Homecomings previously included in the monthly amount due, thereby reducing the escrow component of the amount due to $61.15.[8]

Once Homecomings reduced the monthly amount due as of August 1, 2003, Plaintiff made all Loan Payments on time and at least in the amounts asserted by Homecomings or Defendant, as the case may be, as being due on the Loan. This is shown on Appendices A and B, by comparing the column "Total Payment Due [Homecomings/Defendant]" with the column "Amount of Payment." Thus, during the entire time Defendant serviced the Loan during the Plan term, the Newcomers made Loan Payments on time and in an amount at least equal to the amount that was due on the Loan.

As stated above, however, each of the Newcomers' monthly Loan Payments was considerably less than the amount Homecomings contended was due each month from the beginning of the Plan until the August 1, 2003 payment. *See* Appendix A (*compare* the column "Total Payment Due Homecomings" *with* the column "Amount of Payment" for the period 4/01/02 through 7/01/03). Accordingly, at the time Homecomings

---

[8] The reduction in the monthly amount due was also attributable to a reduction in the interest rate that applied to the Loan. *See* n. 5. As stated above, the parties are not in dispute about the amount of the monthly principal and interest components of the Loan Payments, but only the amount of the monthly escrow amounts that should have been included in the Loan Payments.

transferred the servicing rights to Defendant, the Loan was not current on a post-petition basis according to Homecomings' records.  Therefore, when Defendant began servicing the Loan, the information it received from Homecomings was that the Loan was not current on a post-petition basis.

After Defendant began servicing the Loan, it twice filed motions for relief from the automatic stay alleging the Loan was in post-petition default.  On each occasion, it withdrew the motion after Plaintiff submitted proof of post-petition Loan Payments.

B.  Facts re: Defendant's Alleged Violation of the Automatic Stay.

Homecomings transferred the servicing rights on the Loan to Defendant in February 2004.  In the process of transferring information concerning the Loan, Defendant uploaded loan servicing comments from a Homecomings' tape.  The comments are set forth in Defendant's "Composite Report: Comments-Loan#xxxx6428 Borrower Name:  Louise Newcomer" (the "Composite Report") (Pl. Ex. 25).  The Composite Report contains the following notes, dated February 13, 2004:

- 2/13/2004        Prev servicer – plan confirmed 20021022
- 2/13/2004        Prev servicer – prelim hearing / relief 20040301
- 2/13/2004        Prev servicer – POC filed 20020801
- 2/13/2004        Prev servicer – copy of plan requested 20020716
- 2/13/2004        Prev servicer – FC suspended 20020313
- 2/13/2004        Prev servicer notified of the Bk filing 20020318
- 2/13/2004        Prev servicer timeline – Ch 13 Bankruptcy filed 20020313

The numbers at the end of each note represent a date in a YearMonthDate format.  There is no dispute between the parties that the notes mean the following (in the same order in which they are listed above):

- o The Plan in Plaintiff's case was confirmed on 10/22/02
- o A preliminary hearing on Homecomings' motion for relief from stay was scheduled for 3/01/04 in Plaintiff's case

- o Homecomings filed a proof of claim in Plaintiff's case on 8/1/02
- o Homecomings requested a copy of the Plan on 7/16/02
- o Homecomings suspended the foreclosure sale on the Property on 3/13/02
- o Homecomings was notified about Plaintiff's bankruptcy filing on 3/18/02
- o Plaintiff filed his bankruptcy case on 3/13/02

Thus, Defendant received from Homecomings the above information concerning the existence and status of Plaintiff's bankruptcy case on or about February 4, 2004.

The above excerpts from the Composite Report are included among 42 entries dated February 13, 2004. Four of these entries state "Prev servicer – Ch 13 Bankruptcy filed," each with a different date, as follows:

Prev servicer – Ch 13 Bankruptcy filed 20020313
Prev servicer – Ch 13 Bankruptcy filed 20001003
Prev servicer – Ch 13 Bankruptcy filed 20000605
Prev servicer – Ch 13 Bankruptcy filed 19991201

The Court takes judicial notice that Mrs. Newcomer filed chapter 13 bankruptcy petitions on October 3, 2000, and December 1, 1999.

Shortly after Defendant began servicing the Loan, an employee of Defendant read the notes and sought to obtain information from PACER about a bankruptcy case. The notes did not identify a particular bankruptcy case by name or number. Because Mrs. Newcomer was the sole obligor on the Loan, the employee checked PACER for any bankruptcy filings by Mrs. Newcomer. The employee discovered that Mrs. Newcomer was a debtor in two previous Chapter 13 cases but her cases had been closed and there was no open case for Mrs. Newcomer. Therefore, the employee concluded that no applicable bankruptcy case was open and did not refer the Loan to Defendant's bankruptcy group for servicing, as otherwise would have been the case. Defendant thus

began servicing the Loan in February 2004 as if its obligor, Mrs. Newcomer, was not a debtor in a bankruptcy case and as if the automatic stay did not apply.

Defendant sent a "Validation of Debt Notice" to Mrs. Newcomer, dated February 23, 2004. It also sent to Mrs. Newcomer a "Notice of Default and Intent to Accelerate" dated March 11, 2004, and a "Notice of Default and Intent to Accelerate" dated March 12, 2004 (collectively the "March 11 and 12 Letters"). The March 11 and 12 Letters are identical with the exception of the amount necessary to bring the loan current: the amounts are $7173.17 and $6381.24, respectively.

In addition, after Defendant began servicing the Loan, it placed numerous automatic phone calls to the Newcomers' home for about a two-week period from early- to mid-March 2004. Defendant's records reflect that none of these calls were answered, and neither Plaintiff nor Mrs. Newcomer received any of these calls. Plaintiff was not even aware that these calls were made until he learned of them from documents obtained in discovery.

When Plaintiff received the March 11 and 12 Letters, he called Defendant on March 17, 2004 to inform it that he was a debtor in a bankruptcy case and the Property was subject to the automatic stay. Insofar as the record established, this was the first time Defendant had actual knowledge of the existence of Plaintiff or that he had any connection to the Loan or the Property.[9] The Loan was then referred to Defendant's bankruptcy department. Defendant stopped making the automatic calls soon thereafter and took no further action on the March 11 and 12 Letters.

---

[9] Plaintiff points to a January 24, 2004 letter from the chapter 13 trustee to Homecomings and Defendant which identifies Plaintiff's bankruptcy case as evidence that Defendant knew of the case. But Defendant testified that the address was not correct and it did not receive the letter. The Court finds that Defendant did not receive the letter based on the testimony, and also on the fact that the letter is not mentioned in either Homecomings' or Defendant's detailed reports of all activity on the Loan. *See* Pl. Ex. 24B and 25.

## CONCLUSIONS OF LAW

Plaintiff contends that Defendant violated the automatic stay of §362, the effect of confirmation under §1327, and the discharge provision of §1328. The Court will address each in turn.

A. Alleged Violation of the Automatic Stay

1. The March 11 and 12 Letters and the Automated Calls

Plaintiff contends that Defendant violated the automatic stay of §362 by sending the March 11 and 12 Letters and by placing numerous automatic calls to the Newcomer household in early- to mid-March 2004. The Court addressed these issues in part in its summary judgment decision, entered at Docket No. 186 (the "Memorandum Opinion"), and begins with a review of that decision and its effect on the trial.

In the Memorandum Opinion, the Court ruled that Defendant violated the automatic stay in sending the March 11 and 12 Letters because the letters threatened to foreclose against the Property, which was property of the estate. In support of his motion for summary judgment, Plaintiff relied on deposition testimony of Defendant's representative, as follows:

Q (by Plaintiff's Counsel): Isn't it true then that Litton was aware of the Newcomers' bankruptcy at the – at least as of February 13th, 2004?

(Defendant's Counsel): Objection, calls for – the document says what it says.

A. Yes.

McNaulty Deposition (January 22, 2009), p. 9. The deposition testimony was based on the February 13, 2004 notes in the Composite Report, as addressed in the Findings of Fact.

The Court concluded that the violation was willful because, in its opposition to Plaintiff's summary judgment motion, Defendant did not dispute that it was aware of Plaintiff's bankruptcy case before it sent the March 11 and 12 Letters.[10]  The Court reserved for trial the question whether the automated telephone calls made in early- to mid-March 2004 constituted violations of the automatic stay and the question of damages.

Defendant filed a Motion for Reconsideration (Docket No. 214) arguing, in relevant part, that the material issue of when Defendant first became aware of Plaintiff's bankruptcy case was in dispute.  Defendant asks the Court to reconsider its ruling that the March 11 and 12 Letters violated the automatic stay, or, in the alternative, to reconsider its ruling that any such violation was willful.  *See* Motion for Reconsideration, pp. 3, 5. The Motion for Reconsideration is based on Defendant's response to an additional Interrogatory propounded orally by Plaintiff at the summary judgment hearing, which response was filed after the Court issued the Memorandum Opinion.[11]

At trial, notwithstanding the ruling on summary judgment that Defendant willfully violated the automatic stay by sending the March 11 and 12 Letters, the Court

---

[10] As stated in the Memorandum Opinion:  "To prove a willful violation of the stay, it is not necessary to show that the creditor had the specific intent to violate the stay.  It is sufficient to show that the party knew of the existence of the bankruptcy case and that the creditor's actions were intentional."  Memorandum Opinion, p. 19 (quoting *In re Clayton*, 235 B.R. 801, 807 (Bkrtcy.M.D.N.C. 1998) (citations omitted)). The Court concluded:  "It is undisputed that, by March 11, 2004, Defendant was aware of Plaintiff's bankruptcy case and that the Property was property of the estate.  Defendant's actions in sending the March 11 Acceleration Letter and the March 12 Acceleration Letter were sufficient to constitute a willful violation of the automatic stay."  *Id.*

[11] At the outset of the summary judgment hearing, the Court heard argument on Plaintiff's Motion for Order Compelling Discovery (Docket No. 128).  The essence of the motion was Plaintiff's inquiry as to when Defendant received information that put Defendant on notice of Plaintiff's bankruptcy case.  The Court allowed Plaintiff's counsel to propound an oral interrogatory to that effect.  Defendant's response was as follows:  "Litton states that the first it learned of Kevin Newcomer's bankruptcy case was on March 17, 2004, as reflected by an entry on Litton's Composite History Report, when Kevin Newcomer called Litton and informed Litton that he had filed for bankruptcy."  Docket No. 194-1, p. 2.  This document was filed on May 3, 2009, after the Court had issued its Memorandum Opinion ruling on the cross-motions for summary judgment.

allowed the testimony concerning Defendant's employee's action in checking PACER for a bankruptcy case for Mrs. Newcomer. This testimony is relevant on the question of damages, as Plaintiff seeks both actual damages, including damages for emotional distress, and punitive damages for the stay violation.[12]   It is relevant to the Motion for Reconsideration as well.

The testimony established that Defendant was "aware" of Plaintiff's bankruptcy case before it sent the March 11 and 12 Letters only to the extent of the existence of the notes in the Composite Report. However, as stated in the Findings of Fact, when the employee read the notes and performed a PACER search, the employee found no open bankruptcy case for Mrs. Newcomer, the sole obligor on the Loan. The employee concluded that no applicable bankruptcy case was open and did not refer the Loan to Defendant's bankruptcy group for servicing. Thus, Defendant proceeded to service the Loan as if no automatic stay applied to it until Plaintiff called Defendant on March 17, 2004 to inform it of his bankruptcy case and co-ownership of the Property.

These facts, as opposed to those before the Court when it issued the Memorandum Opinion, do not support the conclusion that Defendant willfully violated the automatic stay. Accordingly, the Court will grant Defendant's Motion for Reconsideration. Further, as discussed below, even if the Court were to deny reconsideration of its ruling

---

[12] As the court in *In re Campion*, 294 B.R. 313 (BAP 9th Cir. 2003), stated:

> The only solace for the creditor who winds up willfully violating the automatic stay without meaning to do so is that a good heart may figure in the assessment of §362(h) damages. Sympathetic facts may be used to avert punitive damages and, in view of the trial judge's discretion over calculation of actual damage awards, may also figure into the calculus of actual damages.

*Id.* at 318. (The 2005 amendments to the Bankruptcy Code redesignated §362(h) as §362(k). *See* Pub. L. No. 109-8 (2005)). Accordingly, the facts that led to Defendant sending the letters and the efforts Defendant undertook to determine if a bankruptcy case applied are relevant to Plaintiff's claim for damages.

on summary judgment, the Court would not award damages for such a violation under these circumstances.

For the reasons set forth in the Memorandum Opinion, the March 11 and 12 Letters violated the automatic stay.  *See* Memorandum Opinion, pp. 18-19.  The violation, however, was not willful.  The evidence established that at the time Defendant sent the March 11 and 12 Letters, it believed no bankruptcy case applied to the Loan.  This belief was not unwarranted.  The only obligor on the Loan was Mrs. Newcomer, and Defendant knew nothing of Plaintiff or his ownership interest in the Property.  Further, the evidence established that had Defendant been aware of the existence of Plaintiff's bankruptcy case and his interest in the Property, it would not have sent the March 11 and 12 Letters.  Rather, it would have referred the Loan to its bankruptcy servicing group, as it did once it was informed of Plaintiff's case in the March 17 phone call.  Finally, Defendant's employee's actions were taken in a good faith attempt to determine if a bankruptcy case applied to the Loan.

To be sure, as a result of the notes in the Composite Report, Defendant initially had constructive knowledge of Plaintiff's bankruptcy case, and constructive knowledge may be sufficient for a determination that a violation of the stay is "willful."  *See In re Skinner*, 90 B.R. 470, 479-480 (D.Utah 1988) (constructive knowledge sufficient to establish willful violation of stay);  *In re Withrow*, 93 B.R. 436, 437 (Bankr.W.D.N.C. 1988) (same).  *See also In re Crawford*, 388 B.R. 506, 519 (Bankr.S.D.NY 2008) (knowledge of agent imputed to principal, constituting sufficient basis for finding willful violation).  However, that constructive knowledge was supplanted by the erroneous, albeit justified, conclusion that no bankruptcy case applied to the Loan.   Defendant's

confusion regarding Plaintiff's bankruptcy case was justified because Plaintiff was not an obligor on the Loan and Mrs. Newcomer's bankruptcy cases had been dismissed and closed.

Further, there is no evidence that Plaintiff suffered any damages as a result of receiving the March 11 and 12 Letters. After receiving the letters, Plaintiff called Defendant and Defendant quickly classified the Loan as one subject to bankruptcy after it understood Plaintiff's role. He was not required to take any further action with respect to the letters. Plaintiff did not seek damages for the March 11 and 12 Letters until he filed the complaint in this adversary proceeding more than three years after he received them. By that time, the error concerning the existence of Plaintiff's bankruptcy case and its applicability to the Loan had long since been resolved.

Plaintiff also contends that Defendant's automated phone calls made in early- to mid-March 2004 constituted violations of the automatic stay for which he should be compensated. The Court disagrees for numerous reasons, including: (1) for the reasons stated above, Defendant was not aware of Plaintiff's bankruptcy case when it made the calls, and therefore any violation was not willful; (2) the evidence established that the calls were an attempt to collect a debt from Mrs. Newcomer, who was not in bankruptcy, and therefore they did not violate the automatic stay; (3) neither Plaintiff nor Mrs. Newcomer even knew the calls were made until they learned of them in discovery; and (4) Plaintiff suffered no damages as a result of the calls being made.

2. Homecomings' Post-petition Collection of the Prepetition Escrow Deficiency

As stated in the Findings of Fact, at the time Plaintiff filed his bankruptcy case, the Prepetition Escrow Deficiency existed in the amount of $2,823.83. This constituted a

prepetition amount owed on the Loan and therefore was included in the amount secured by the Property. Homecomings included it, at least to the extent of $2,129.40,[13] in the Loan Arrears set forth on the proof of claim. As such, Homecomings sought to recover it through the Plan Payments. Homecomings also included the Prepetition Escrow Deficiency in the "escrow shortage spread" in the August 2002 Escrow Analysis, thereby seeking to recover it through the post-petition Loan Payments. Accordingly, Homecomings sought to recover at least $2,129.40 of the Prepetition Escrow Deficiency twice – through Plan Payments and post-petition Loan Payments.

Homecomings' action raises two issues: First, in doing so, did Homecomings violate Debtor's cure rights under the Plan, and if so, to what extent is Defendant responsible? This issue is addressed in the subsequent section of this opinion. Here, the Court addresses whether Homecomings violated the automatic stay by seeking to collect a prepetition Loan obligation through post-petition Loan Payments, and, again, if so, to what extent is Defendant responsible?

Section 362(a)(6), prohibits a creditor from taking "any act to collect … or recover a claim against the debtor that arose before the commencement of the case. . . . ." 11 U.S.C. §362(a)(6). Homecomings itself included at least $2,129.40 of the Prepetition Escrow Deficiency in its proof of claim, thereby acknowledging under oath that this amount was a prepetition obligation under the Loan. There is no doubt that if Plaintiff were obligated on the Loan, Homecomings would have violated the automatic stay by collecting the Prepetition Escrow Deficiency through the post-petition Loan Payments, because it was an "act to collect . . . or recover" a prepetition claim.

---

[13] *See* n. 7, *supra*.

Here, of course, Plaintiff is not obligated on the Loan.  Nevertheless, the Bankruptcy Code defines "claim against the debtor" to include "claim against property of the debtor." 11 U.S.C. §102(2).  Thus, Homecomings' effort to collect the Prepetition Escrow Deficiency through post-petition Loan Payments was an "act to collect … or recover a *claim against the debtor* that arose before the commencement of the case" in violation of §362(a)(6). 11 U.S.C. §362(a)(6) (emphasis added).

However, it was Homecomings, not Defendant, that included the Prepetition Escrow Deficiency in the post-petition Loan obligation calculation and collected it through post-petition Loan Payments.  Plaintiff named Homecomings as a defendant in this action but settled with it, and Homecomings is no longer a party.  By the time Defendant took over servicing the Loan, these amounts were no longer included in the post-petition amounts due on the Loan, as shown by the May 2003 Escrow Analysis, and were not collected by Defendant in any Loan Payment.  *See* Appendix B.  Accordingly, the Court concludes that Plaintiff is not entitled to relief against Defendant for the violation of the automatic stay resulting from Homecomings' post-petition collection of the Prepetition Escrow Deficiency.

B.   The Violation of §1327.

Plaintiff contends that Defendant violated §1327 by misapplying Plan Payments and Loan Payments during the Plan term.  Specifically, Plaintiff contends that Defendant violated §1327 because, during the Plan term, it did not apply Plan Payments strictly to the prepetition arrears or Loan Payments strictly to post-petition Loan payments. Plaintiff also contends that Defendant's accounting system, which did not differentiate between Plan Payments and Loan Payments, violated §1327.  Defendant does not dispute

the factual underpinnings of these contentions, but argues that these contentions do not constitute a violation of §1327 because, among other reasons, Defendant conducted a bankruptcy audit of the Loan and ultimately sorted out the proper application of the payments to prepetition arrears and post-petition Loan obligations.  Defendant also raises numerous other defenses, which the Court addresses as appropriate.

      1.  The Amount of Post-Petition Arrears

Section 1327 provides that "[t]he provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or rejected the plan."  11 U.S.C. §1327(a).  As noted in the Findings of Fact, the Plan provided, in relevant part, that "the trustee will cure all pre-petition arrears, costs and fees in full (100%), required by 11 USC §1325(a)(5) on the following claim . . . Homecomings Financial Network."  Pl. Ex. 2, p. 1.  The Plan also provided, in the section titled "11 USC 1322(b)(5) Claims," that "the debtor shall maintain post-petition payments directly while the case is pending."  *Id*.  Accordingly, under the Plan and §1325(a)(5), Plaintiff was obligated to make monthly Plan Payments, from which the chapter 13 trustee paid Homecomings, and later Defendant, in order to cure the pre-petition default on the Loan, while the Newcomers kept the Loan current on a post-petition basis.

As an initial matter, the parties dispute the significance of the fact that Plaintiff was not obligated on the Loan.  Defendant contends that, because only Mrs. Newcomer was obligated on the Loan, Plaintiff should be denied any relief because he had no duties or obligations under the Loan.  Plaintiff contends that Homecomings subjected itself to

the Plan and Bankruptcy Code by filing a proof of claim, not objecting to the Plan and accepting Plan Payments from the trustee.

The *in rem* interest in the Property resulting from the Deed of Trust constituted a "claim" in Plaintiff's bankruptcy case. *See Johnson v Home State Bank*, 501 U.S. 78 (1991)(*in rem* mortgage lien as to which debtor's personal liability on the loan was previously discharged is a "claim" in a chapter 13 bankruptcy case). Accordingly, it was proper and appropriate for Homecomings to file a proof of claim.[14] Further, like any claim, that claim was subject to treatment under the Plan in accordance with the Bankruptcy Code. Here, the treatment was as described above: Plaintiff could cure the prepetition default through Plan Payments and, because the automatic stay applied to the Property during the Plan term, he (and/or Mrs. Newcomer) could keep the Loan current post-petition while they cured the default.[15] The Plan, then, provided Plaintiff (and Mrs. Newcomer) the opportunity to cure the Loan default even though Plaintiff was not obligated on the Loan. If all Plan Payments and Loan Payments were made timely and in full, at the end of the Plan term the prepetition default would be cured and the Loan would be current post-petition.

---

[14] Defendant argues that it was improper for Plaintiff to include Mrs. Newcomer's Loan on his Schedule D. However, the majority view since the Supreme Court's decision in *Johnson v Home State Bank*, 501 U.S. 78 (1991), properly taking into account the reasoning of *Johnson*, is that it is appropriate to "permit[] a Chapter 13 debtor who is the owner of real property to cure a pre-petition default under a mortgage, even if the debtor lacks privity with the mortgagee." *See In re Trapp*, 260 B.R. 267, 271 (Bkrtcy.D.S.C. 2001). *See also, e.g.*, *In re Garcia*, 276 B.R. 627, 631-632 and n. 9 (Bkrtcy.D.Ariz. 2002); *In re Rutledge*, 208 B.R. 624, 628 (Bkrtcy.E.D.N.Y. 1997); *In re Hutcherson*, 186 B.R. 546 (Bkrtcy.N.D.Ga. 1995). The Court also notes that Homecomings and Defendant both actively participated in the bankruptcy case and neither ever raised this objection prior to confirmation, during the Plan payment period, or at discharge.

[15] Defendant filed two motions for relief from the automatic stay during the Plan term. Although it withdrew both, the motions are an acknowledgement that the automatic stay applied to the Property. Because the automatic stay applied, neither Homecomings nor Defendant could seek to foreclose on the Property as a result of the prepetition default even though Plaintiff was not obligated on the Loan. It did not matter whether the post-petition Loan Payments were made by Plaintiff or Mrs. Newcomer, as long as the Loan was current.

With respect to the prepetition Loan default, neither party disputes that Plaintiff made all Plan Payments, and the prepetition default has been cured. Thus, Plaintiff has obtained one of the primary benefits of a chapter 13 plan – he has cured the prepetition default on the Loan.

The same cannot be said with respect to post-petition Loan Payments. As set forth in the Findings of Fact, while Homecomings serviced the Loan post-petition its records show Plaintiff's total Loan Payments were $2,560.27 less than Homecomings' records reflected was due. *See* Findings of Fact, §A.2; *see also* Appendix A. While Defendant serviced the Loan until Plan completion, its records show that Plaintiff's total Loan Payments were $348.27 more than Defendant's records reflected was due. *See* Findings of Fact, §A.2; *see also* Appendix B. This means that, during the entire Plan term, the total Loan Payments made by Plaintiff were $2,212.00 less than the principal, interest and escrow due according to Homecomings' and Defendant's records.

The shortfall primarily results from the fact that for every month for the period April 1, 2002 through July 1, 2003, the amount of Plaintiff's monthly Loan Payment was considerably less than the amount due per Homecomings' records. *See* Appendix A.[16] The difference, in each case, was attributable solely to the escrow component of the monthly Loan Payment, and in particular the "escrow shortage" portion of that payment. As stated in the Findings of Fact, the "escrow shortage" each month constituted an allocated portion of the Prepetition Escrow Deficiency.

---

[16] In addition, for the nine monthly payments due from April 1, 2002 through December 1, 2002, Plaintiff made five of those Loan Payments after the fifteen-day grace period allowed in the Loan documents (April 1, June 1, August 1, September 1 and November 1). *See* Appendix A, "Date Payment Made" entries for April 1, 2002 through December 1, 2002). Thus, Plaintiff made five post-petition Loan Payments late, subjecting those payments to late charges.

As the August 2002 Escrow Analysis shows, Homecomings anticipated the annual property tax obligation to be $733.91, and it included 1/12 of that amount ($61.16) in the escrow component of the new monthly amount due on the Loan.  *See* Def. Ex. 4, pp. 2, 3.  In addition, Homecomings then simply applied the Prepetition Escrow Deficiency as the "escrow shortage" component in the new monthly amount due on the Loan, thereby seeking to recover it from post-petition Loan Payments.  But Homecomings also included at least $2,129.40 of the Prepetition Escrow Deficiency in the proof of claim and therefore recovered that amount through the Plan.  Homecomings plainly sought to recover the Prepetition Escrow Deficiency twice.  It also plainly required Plaintiff (and Mrs. Newcomer) to pay a prepetition obligation in order to keep the Loan current on a post-petition basis.

Homecomings' actions violated the Plan.  A chapter 13 plan is a "new and binding contract, sanctioned by the court, between the debtors and their pre-confirmation creditors."  *In re Murphy*, 474 F.3d 143, 148 (4th Cir. 2007) (citations omitted). [17]  The Plan provided that Plaintiff would "maintain post-petition payments" to Homecomings. Pl. Ex. 2, p. 1.  Plaintiff did this.  But Homecomings required Plaintiff to do more – in order to keep the Loan current post-petition, Homecomings required the Newcomers to pay a prepetition obligation through their post-petition payments (*i.e*., the Prepetition Escrow Deficiency).  By requiring the Newcomers to pay a prepetition obligation in order to keep the Loan current post-petition, Homecomings violated the Plan and §1327.

---

[17] Defendant contends it was not a "prepetition creditor" of Plaintiff, and therefore the Plan was not binding on it.  This Court disagrees.  The term "creditor" is defined, in relevant part, as an "entity that has a claim against the debtor."  11 U.S.C. §101(10)(A).  The phrase "claim against the debtor" includes a "claim against property of the debtor."  11 U.S.C. §102(2).  Thus, the holder of the *in rem* claim resulting from the Deed of Trust was a prepetition creditor of Plaintiff.

Homecomings violated the Plan in a second way. Leaving aside the Prepetition Escrow Deficiency, the August 2002 Escrow Analysis required the Newcomers to pay a monthly amount on the Loan that even Homecomings and Defendant now concede was not the correct amount due. As set forth in the Findings of Fact, the new monthly amount due in the August 2002 Escrow Analysis was $64 greater than the amount Homecomings or Defendant now states is the correct amount due for the period of April 2002 through June 2002. The new monthly amount due was $126.14 greater than the amount Homecomings or Defendant now states is the correct amount due for the period of July 2002 through October 2002. Thus, Homecomings showed the Newcomers as having post-petition arrears due on the Loan, based to some extent on Homecomings' own incorrect information.

Plaintiff seeks from Defendant emotional distress damages and punitive damages, and damages for his alleged inability to refinance the Loan. However, it was Homecomings, not Defendant, that sought to double collect the Prepetition Escrow Deficiency, to collect a prepetition obligation post-petition and that notified the Newcomers of the incorrect amount due on the Loan. As stated above, Plaintiff settled its dispute with Homecomings. By the time Defendant began servicing the Loan, the monthly Loan obligation no longer included a component for the Prepetition Escrow Deficiency. *See generally* Appendix B.

There is no basis to impose such liability on Defendant, as a subsequent loan servicer, for Homecomings' actions. Assuming the types of damages Plaintiff seeks are available for a violation of a Plan, they would have to be imposed based on Defendant's, not Homecomings', actions. Here, however, it is sufficient to state that the testimony

concerning Plaintiff's frustration with Defendant's Loan servicing does not come close to the level of emotional distress that is necessary to be compensable.  Further, Plaintiff alleges that because of Defendant's actions he was unable to refinance the Loan at a lower interest rate.  However, there is no evidence that Plaintiff applied for a refinance loan or even asked for a post-petition Loan history.

However, the Court ruled on summary judgment that §105 of the Bankruptcy Code empowers the Court to enforce a party's substantive rights under §1327.  Memorandum Opinion, pp. 22-24.  Here, while Plaintiff is not entitled to the broad affirmative relief he seeks, he is entitled to some relief.   It is apparent from the record that the amount Defendant currently contends is due on the Loan is incorrect, due to Homecomings' improper inclusion of the Prepetition Escrow Deficiency as a post-petition obligation.  Defendant currently services the Loan, and collects and applies Loan Payments against the amounts due.  The Court will enter an order requiring Defendant to recalculate the amount due on the Loan by eliminating any prior obligation to repay the Prepetition Escrow Deficiency from Loan Payments after April 1, 2002.  In doing so, Defendant also shall reverse any late charges imposed by it or Homecomings for late payments resulting from the Newcomers' failure to pay a Loan Payment in full where the shortage is attributable to the Prepetition Escrow Deficiency.  By way of example, the line entry for 4/01/02 on Appendix A shall include only $61.16 in the "Amount of Escrow . . ." column, rather than $286.98.

Finally, the Court addresses whether Plaintiff should receive an award of attorney fees from Defendant.  In his proposed findings of fact, Plaintiff stated that "[s]hould the Court enter a verdict in his favor, [he] intends to file a petition for fees and costs."

Docket No. 220, p. 33.  Accordingly, the Court will allow Plaintiff to file a petition seeking attorney's fees and costs, focusing specifically on Defendant's, rather than Homecomings', conduct.  In this regard, the Court notes that Plaintiff cites no authority, and the Court knows of none, that requires a subsequent servicer to review the entire loan history to search for errors by a previous servicer.  Thus, at the time Defendant acquired the servicing rights to the Loan, it was entitled to rely on Homecomings' Loan history.  But between February 2004 and the time of trial, Defendant learned much information about the Loan while Homecomings serviced it.  For example, Defendant, not Plaintiff, introduced the August 2002 Escrow Analysis at trial, and that document on its face shows numerous problems that Defendant should have taken into account in determining, even today, what is the correct amount due on the Loan.  The Court will take these matters up in connection with Plaintiff's petition for fees and costs.

2.  Defendant's Accounting System

Plaintiff contends that Defendant's accounting system violates §1327.  Defendant uses an accounting software system known as LSAMS to account for transaction activities on the loans it services.  According to Defendant, this system is used by many loan servicers and was one of the three primary residential mortgage accounting systems available on the market to residential mortgage servicing companies and residential mortgage companies.

The LSAMS accounting software system is not capable of distinguishing between payments received from a trustee under a plan and payments received from a borrower outside of the bankruptcy case.  Thus, generally speaking, it applies all payments received on a loan against the earliest contractual obligation.

Defendant maintains a bankruptcy department that services loans which are the subject of a bankruptcy case.  Once a bankruptcy case is filed and Defendant is notified, the servicing for that loan is transferred to the bankruptcy department.  The bankruptcy department performs a "bankruptcy audit" that consists of a manual accounting process intended to reconcile and track payments received from a chapter 13 trustee and apply such payments to prepetition amounts, and to reconcile and track payments received from the borrower and apply such payments to post-petition amounts.

Defendant's accounting system, and the application of Plan Payments and Loan Payments during the Plan term, was a central issue throughout the trial. The parties cited numerous cases addressing the application of plan payments and loan payments under chapter 13.  The Court finds, however, that the dispute between the parties concerning whether the Loan is current post-petition has little, if anything, to do with Defendant's accounting system or how it applied the Plan Payments and Loan Payments.  As the Court noted in the Findings of Fact and as addressed at length above, the dispute between the parties stems from the fact that the amount of the Loan Payments made by Plaintiff (and Mrs. Newcomer) was less than the amount Homecomings' records showed was due for the period April 1, 2002 through July 1, 2003.  *See* Appendix A.  That, in turn, implicates the appropriateness of including the Prepetition Escrow Deficiency in post-petition payments, all as addressed above.  Even if Defendant's accounting system allowed it to apply Plan Payments against the prepetition default and Loan Payments directly against the corresponding Loan obligation immediately upon receipt, as Plaintiff contends should have been done and as shown on Appendices A and B, Defendant's records would still reflect that Plaintiff failed to keep the Loan current post-petition

30

because of the payment issues from April 1, 2002 through July 1, 2003. Thus, Defendant's use of the LSAMS accounting system provides Plaintiff with no avenue for relief.[18]

### C.   Defendant Did Not Violate §1328(a).

Plaintiff contends that Defendant violated the discharge injunction of §1328(a)[19] by failing to properly apply Plan Payments to the Loan arrearages and by pursuing collection efforts against Plaintiff. Although the Defendant raises a number of defenses to this contention, the short answer is that, assuming the discharge provision of §1328(a) even applies to Plaintiff with respect to the Loan, the evidence failed to establish that Defendant took any action against Plaintiff after the discharge order was entered that violated §1328(a). Accordingly, this contention fails.

The chapter 13 trustee filed the Notice of Completion of Chapter 13 Plan on October 19, 2006. The Plaintiff received his discharge by order entered that same date. Thus, any violation of §1328(a) must have occurred, if at all, after October 19, 2006.

A bankruptcy discharge extinguishes "the personal liability of the debtor with respect to any debt." 11 U.S.C §524(a)(1). Under §524(e), aside from an exception not relevant here, the "discharge of a debt of the debtor does not affect the liability of any entity on . . . such debt."[20] Thus, Plaintiff's discharge did not affect the liability of Mrs.

---

[18] The Court makes no conclusions of whether it would reach a different result if §524(i), added to the Bankruptcy Code by the 2005 amendments to the Bankruptcy Code (*see* Pub. L. No. 109-8 (2005)), applied to this case, or if Paragraph 4 of the current form Chapter 13 Plan used in this District was included in the Plan.

[19] Section 1328(a) provides, in pertinent part:

> [A]s soon as practicable after completion by the debtor of all payments under the plan, . . . . the court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under section 502 of this title. . . .

[20] Section 524(e) provides, in pertinent part:

> [D]ischarge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.

Newcomer on the Loan, and efforts by Defendant to collect the Loan from Mrs.

Newcomer would not violate §1328(a).

Here, because the Loan was solely in Mrs. Newcomer's name, Defendant took no

actions in the name of Plaintiff outside of the bankruptcy case unless specifically

requested to do so by Mrs. Newcomer.  Defendant's internal records reflected that only

Mrs. Newcomer was the obligor on the Loan.  Defendant addressed letters to Mrs.

Newcomer and reported the status of the Loan to the credit agencies in the name of Mrs.

Newcomer only.  *Compare* Def. Ex. 27 (April 3, 2007 credit report of Mrs. Newcomer

showing reporting by Defendant) *with* Defendant's Exhibit 28 (May 2, 2007 credit report

of Plaintiff showing no reporting by Defendant).  All letters or correspondence in the

record sent by Defendant after October 19, 2006 and until February 2007 were addressed

to Mrs. Newcomer, not Plaintiff.  *See* Pl. Ex. 38, 40 and 52 (correspondence by

Defendant after the date of discharge addressed solely to Mrs. Newcomer).

Indeed, because Plaintiff was not an obligor on the Loan, Defendant would not

discuss the Loan with Plaintiff.  On February 13, 2007, Mrs. Newcomer sent a letter to

Defendant in which she authorized Plaintiff "to speak on [her] behalf" regarding the

Loan.  Pl. Ex. 40, p. 7.  She further authorized Plaintiff to "obtain any pertinent

information he deems necessary in order to speak, write or act *on my behalf* regarding

[the Loan]."  *Id*. (emphasis added).  Thereafter, as far as the record shows, Defendant sent

one letter to Plaintiff, dated March 14, 2007, specifically answering his question

concerning application of check number 724 and the status of the Loan.  *See* Pl. Ex. 38, p.

7.  This letter does not violate §1328(a) because it is simply responding to an inquiry

from Plaintiff.   More to the point, however, it was sent to Plaintiff, as opposed to Mrs.

32

Newcomer, only because Mrs. Newcomer requested that Defendant communicated with the Plaintiff "on [her] behalf."  Pl. Ex. 40, p. 7.  Plaintiff may have been making an authorized inquiry on behalf of Mrs. Newcomer but, insofar as Defendant was concerned, she was the sole obligor on the Loan.

Plaintiff relies on *In re Rizzo-Cheverier*, 364 B.R. 532 (Bankr. S.D.N.Y. 2007), for the proposition that a lender's failure to apply plan payments in accordance with a plan can serve as a basis for a claim of discharge violation.  But in that case, the debtor was personally obligated on the loan, and, as Plaintiff expressly recognizes, "[a]fter the debtor received her discharge, the lender reported her account as late to the credit reporting agencies and threatened to foreclose on her home."  Docket No. 222, p. 18.  Defendant took no such action against Plaintiff here.  Accordingly, the case provides no support for Plaintiff.

Plaintiff also refers generally to the "repeated letters and calls to the Newcomers' home" that the Court "pointed out in its memorandum on summary judgment" as violations of §1328(a).  Docket No. 222, p. 19.  In the Memorandum Opinion, however, the Court addressed (1) letters to Mrs. Newcomer in February and March 2004, which could not violate §1328(a) because they were pre-discharge; and (2) a call between Mrs. Newcomer and Defendant in March 2007, which could not violate §1328(a) because it was between Mrs. Newcomer, not Plaintiff, and Defendant.  *See* Memorandum Opinion, pp. 17-20.  The Court also pointed out that the deposition transcripts referred to "numerous conversations" between Plaintiff and Defendant's representatives, but stated that the nature and content of the calls were not clear from the record and held that issue

over for trial. *Id*. at 20-21. The evidence at trial failed to establish that any such letters or calls were directed to Plaintiff after October 19, 2006.

Finally, the Court has serious misgivings that the discharge provision of §1328(a) even applies to the Loan. Plaintiff was not an obligor on the Loan. He did not sign the Note or the Deed of Trust. *See* Findings of Fact, §A. He acquired his interest in the Property well after the Loan was made and the Property was subject to the Deed of Trust. When he acquired his interest in the Property, it was with the express statement that "no grantee is assuming liability for a debt … in this transaction." *Id*. As stated above, the discharge in bankruptcy discharges the personal liability of a debtor for a debt. *See* §524(a)(1). Here, although the Deed of Trust interest was an *in rem* claim against the estate, Plaintiff never had any "personal liability" for the Loan that was subject to being discharged.

## CONCLUSION

The Court will enter an order consistent with this opinion.


**Copies to:**

Matthew G. Summers, Esq.
300 E. Lombard St.
18th Floor
Baltimore, MD 21202

Homecomings Financial, LLC
c/o J. Matthew Goodin, Esq.
Locke Lord Bissell & Liddell, LLP
111 South Wacker Drive
Chicago, IL 60606

Laura J. Margulies, Esq.
Laura Margulies & Associates, LLC
6205 Executive Blvd.
Rockville, MD 20852

Brett Weiss, Esq.
Joseph Creed, Esq.
Joseph, Greenwald and Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770

Kevin and Louise Newcomer
2617 Newton Street
Wheaton, MD 20902

Newcomer v. Litton, Adv. Pro. 07-479
Trial Opinion
Appendix A
LOAN PAYMENTS DUE AND PAYMENTS MADE WHILE HOMECOMINGS
SERVICED THE LOAN

| Date Payment Due | Amount of Princ & Int Due Per Homecomings | Amount of Escrow Due per Homecomings | Total Payment Due per Homecomings | Date Payment Made | Amount of Loan Payment |
|---|---|---|---|---|---|
| 4/01/02 | $910.74 | $286.98 | $1,197.72 | 4/17/02 | $1,149.91 |
| 5/01/02 | $910.74 | $286.98 | $1,197.72 | 5/16/02 | $1,149.91 |
| 6/01/02 | $910.74 | $286.98 | $1,197.72 | 6/18/02 | $1,149.91 |
| 7/01/02 | $848.60 | $286.98 | $1,135.58 | 7/16/02 | $737.43 |
| 8/01/02 | $848.60 | $286.98 | $1,135.58 | 8/20/02 | $1,035.90 |
| 9/01/02 | $848.60 | $286.98 | $1,135.58 | 9/17/02 | $1,035.90 |
| 10/01/02 | $848.60 | $286.98 | $1,135.58 | 10/15/02 | $1,035.90 |
| 11/01/02 | $848.60 | $286.98 | $1,135.58 | 11/18/02 | $1,035.90 |
| 12/01/02 | $848.60 | $286.98 | $1,135.58 | 12/16/02 | $1,035.90 |
| 1/01/03 | $788.54 | $286.98 | $1,075.52 | 1/03/03 | $849.70 |
| 2/01/03 | $788.54 | $286.98 | $1,075.52 | 1/29/03 | $849.70 |
| 3/01/03 | $788.54 | $286.98 | $1,075.52 | 2/28/03 | $849.70 |
| 4/01/03 | $788.54 | $286.98 | $1,075.52 | 3/26/03 | $849.70 |
| 5/01/03 | $788.54 | $286.98 | $1,075.52 | 4/28/03 | $849.70 |
| 6/01/03 | $788.54 | $286.98 | $1,075.52 | 5/13/03[21] | $849.70 |
| 7/01/03 | $730.78 | $286.98 | $1,017.76 | 5/28/03 | $849.70 |
| 8/01/03 | $730.78 | $61.15 | $791.93 | 6/16/03 | $791.94 |
| 9/01/03 | $730.78 | $61.15 | $791.93 | 7/18/03 | $791.94 |
| 10/01/03 | $730.78 | $61.15 | $791.93 | 8/14/03 | $791.94 |
| 11/01/03 | $730.78 | $61.15 | $791.93 | 9/11/03 | $791.94 |
| 12/01/03 | $730.78 | $61.15 | $791.93 | 11/06/03 | $791.94 |
| 1/01/04 | $702.97 | $61.15 | $764.12 | 12/03/03 | $765.00 |
| 2/01/04 | $702.97 | $61.15 | $764.12 | 1/04/04 | $765.00 |
| 3/01/04 | $702.97 | $61.15 | $764.12 | 1/27/04 | $765.00 |
| **TOTALS** | **$19,048.65** | **$5,080.88** | **$24,129.53** | | **$21,569.26** |

**Total Payments Due per Homecomings:**           $24,129.53
**Total Loan Payments made by Newcomers:**           $21,569.26
**Total Loan Payment Shortage while Homecomings serviced:**           ($2,560.27)

---

[21] As addressed in the text, Plaintiff's records reflect that a payment was made on the Loan on May 13, 2004 in the amount of $849.70.  *See* Ex. C to the Report of Kevin M. Byers, CPA.  Defendant's records do not reflect that this payment was made.  *See* Def. Ex. 21.  The Court finds that the payment, in fact, was made.

<u>Newcomer v Litton</u>, Adv. Pro. 07-479
Trial Opinion
Appendix B
LOAN PAYMENTS DUE AND PAYMENTS MADE WHILE DEFENDANT
SERVICED THE LOAN

| Date Payment Due | Amount of Princ & Int Due Per Litton | Amount of Escrow Due per Litton | Total Payment Due per Litton | Date Payment Made | Amount of Payment |
|---|---|---|---|---|---|
| 4/01/04 | $702.97 | $61.15 | $764.07 | 3/11/04 | $791.93 |
| 5/01/04 | $702.97 | $61.15 | $764.07 | 4/26/04 | $764.07 |
| 6/01/04 | $702.97 | $61.15 | $764.07 | 5/26/04 | $764.07 |
| 7/01/04 | $709.75 | $61.15 | $770.90 | 6/09/04 | $770.90 |
| 8/01/04 | $709.75 | $61.15 | $770.90 | 8/04/04 | $770.90 |
| 9/01/04 | $709.75 | $61.15 | $770.90 | 9/02/04 | $770.90 |
| 10/01/04 | $709.75 | $61.15 | $770.90 | 10/04/04 | $770.90 |
| 11/01/04 | $709.75 | $61.15 | $770.90 | 10/22/04 | $770.90 |
| 12/01/04 | $709.75 | $61.15 | $770.90 | 12/02/04[22] | $770.90 |
| 1/01/05 | $764.56 | $61.15 | $825.71 | 1/04/05 | $825.71 |
| 2/01/05 | $764.56 | $61.15 | $825.71 | 1/29/05 | $825.71 |
| 3/01/05 | $764.56 | $61.15 | $825.71 | 3/01/05 | $825.71 |
| 4/01/05 | $764.56 | $61.15 | $825.71 | 3/28/05 | $825.71 |
| 5/01/05 | $764.56 | $61.15 | $825.71 | 4/29/05 | $825.71 |
| 6/01/05 | $764.56 | $61.15 | $825.71 | 5/28/05 | $825.71 |
| 7/01/05 | $820.22 | $61.15 | $881.37 | 6/20/05 | $881.37 |
| 8/01/05 | $820.22 | $61.15 | $881.37 | 7/29/05 | $881.37 |
| 9/01/05 | $820.22 | $61.15 | $881.37 | 8/30/05 | $881.37 |
| 10/01/05 | $820.22 | $61.15 | $881.37 | 9/29/05 | $881.37 |
| 11/01/05 | $820.22 | $61.15 | $881.37 | 10/29/05 | $881.37 |
| 12/01/05 | $820.22 | $61.15 | $881.37 | 12/01/05 | $881.37 |
| 1/01/06 | $869.28 | $61.15 | $930.43 | 1/04/06 | $998.91 |
| 2/01/06 | $869.28 | $61.15 | $930.43 | 1/30/06 | $998.91 |
| 3/01/06 | $869.28 | $61.15 | $930.43 | 2/27/06 | $991.58 |
| 4/01/06 | $869.28 | $61.15 | $930.43 | 3/28/06 | $991.58 |
| 5/01/06 | $869.28 | $61.15 | $930.43 | 4/25/06 | $991.58 |
| 6/01/06 | $869.28 | $61.15 | $930.43 | 5/30/06 | $930.43 |
| 7/01/06 | $926.10 | $61.15 | $987.25 | 7/03/06 | $987.25 |
| 8/01/06 | $926.10 | $61.15 | $987.25 | 7/29/06 | $987.25 |
| 9/01/06 | $926.10 | $61.15 | $987.25 | 8/30/06 | $987.25 |
| 10/01/06 | $926.10 | $61.15 | $987.25 | 9/27/06 | $987.25 |
| **TOTAL** | **$24,796.17** | **$1,895.65** | **$26,691.67** | | **$27,039.94** |

**Total Payments Due per Defendant:**          **$26,691.67**
**Total Loan Payments made by Newcomers:**       **$27,039.94**
**Total Loan Payment overage while Defendant service the Loan:**    **($348.27)**

---

[22]As addressed in the text, Defendant's records reflect that Plaintiff made a Loan Payment on November 10, 2004 in the amount of $764.07. Neither Plaintiff nor his expert contended that this payment was made. The timing and amount of Loan Payments from December 1, 1004 onward point to the conclusion that Plaintiff made Loan Payments each month as if he had not made a Loan Payment of $764.07 on or about November 10, 2004. The Court concludes that Plaintiff did not make a Loan Payment of $764.07 on November 10, 2010.

37

**END OF OPINION**